# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br>vs.<br><br>NICHOLAS EDDARDS,<br><br>                    Defendant. | Case No. 2:19-cr-00289-JAD-NJK<br><br>REPORT AND RECOMMENDATION<br><br>(Docket No. 39) |

This matter was referred to the undersigned Magistrate Judge on Defendant Nicholas Eddards' motion to suppress evidence.  Docket No. 39.  The Court has considered Defendant's motion and exhibits, the United States' response and exhibits, Defendant's reply, and the evidence and arguments presented at an evidentiary hearing held before the Court.  Docket Nos. 39, 40, 43, 44, 45, 55, 57, 58.

I.    **BACKGROUND**

**A.  Testimony of Officer Pappas**[1]

On July 3, 2019, Las Vegas Metropolitan Police Department ("LVMPD") Officer Julien Pappas was assigned to gang enforcement, conducting proactive enforcement in Las Vegas, Nevada.  Hearing Tr. (9/11/2020) at 1:55 p.m.[2]  Officer Pappas was in uniform wearing a body

---

[1]    Officer Pappas is now a Detective.  Since he was an officer at the time the events in the instant case occurred, however, the Court refers to him herein as Officer Pappas.

[2]    Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing.

1   camera, driving a marked police vehicle along with his partner, LVMPD Officer Edgar Nahum.

2   Hearing Tr. (9/11/2020) at 1:55 p.m.  Around 1:00 or 2:00 p.m., the officers came into contact

3   with Defendant, who was driving a 4-door KIA vehicle in the area of Western and Oakey in Las

4   Vegas, Nevada.    Hearing Tr. (9/11/2020) at 1:56 p.m., 1:57 p.m., 3:19 p.m.  Officer Pappas'

5   vehicle passed Defendant's vehicle, which he thought was a rental car, so his attention was drawn

6   to the vehicle because there had been a recent rash of crimes being committed involving rental

7   cars.  Hearing Tr. (9/11/2020) at 3:20 p.m.  Officer Pappas noticed, as he passed by the car, that

8   Defendant was "very aware of the presence" of a marked police vehicle and had a "deer in the

9   headlights" look on his face.  Hearing Tr. (9/11/2020) at 3:20 - 3:21 p.m.  As a result of these

10  circumstances, Officer Pappas turned his vehicle around and drove behind Defendant's vehicle.

11  Hearing Tr. (9/11/2020) at 3:21 p.m.  Officer Pappas initiated a stop of the vehicle after it failed

12  to fully stop at a stop sign in front of the officers' vehicle at Western and Highland.  Hearing Tr.

13  (9/11/2020) at 1:57 – 1:58 p.m., 3:22 p.m.[3]

14       After Officer Pappas turned on his lights and siren to initiate the stop of Defendant's

15  vehicle, Defendant's vehicle turned onto a side street, made two more turns, and then turned into

16  the parking lot of the Artisan Hotel and drove almost to the valet before stopping.  Hearing Tr.

17  (9/11/2020) at 1:55 p.m.  Defendant's failure to immediately made Officer Pappas concerned for

18  officer safety and, in his experience, people who fail to immediately pull over after an officer

19  initiates a vehicle stop may be trying to conceal or hide something, or preparing to flee.  Hearing

20  Tr. (9/11/2020) at 1:59 p.m.

21

22  [3]      Officer Pappas did not cite Defendant for failing to fully stop at the stop sign because he
    thought it is unfair to "stack" offenses against him and also felt that Defendant had enough to deal
23  with because of his arrest.  Hearing Tr. (9/11/2020) at 3:22 p.m.

1      When Defendant's vehicle stopped, Officer Pappas made his initial approach on the

2  driver's side of the vehicle.  Hearing Tr. (9/11/2020) at 1:59 – 2:00 p.m.  As he approached, he

3  could see Defendant's head moving inside the vehicle.    Hearing Tr. (9/11/2020) at 2:00 p.m.

4  Further, rather than rolling his window down, Defendant opened his door, turned his head around,

5  and watched Officer Pappas walk toward him.  Hearing Tr. (9/11/2020) at 2:00 p.m., 2:34 p.m.

6  This action caused suspicion for Officer Pappas – it appeared to him that Defendant was very

7  concerned about the officer's specific location as he approached.  Hearing Tr. (9/11/2020) at 2:00

8  – 2:01 p.m.  When Officer Pappas arrived at the vehicle, he noted that the vehicle had two

9  occupants – Defendant was the driver and he had a passenger in the front seat, Justin Chester.

10  Hearing Tr. (9/11/2020) at 2:02 p.m.  He also noticed that Defendant had a large face tattoo of the

11  Anaheim Angels logo.  Hearing Tr. (9/11/2020) at 2:09 p.m., 2:32 – 2:33 p.m.  Officer Pappas

12  knew from his gang training that, in the early 90s, a street gang in Las Vegas that was involved in

13  violent crimes used that logo.  Hearing Tr. (9/11/2020) at 2:10 p.m.  For safety purposes, Officer

14  Pappas explained who he was, gave the reason he stopped the vehicle, and asked if there were any

15  guns, bombs, or dead bodies in the vehicle.  Hearing Tr. (9/11/2020) at 2:02 p.m.  Defendant gave

16  Officer Pappas his identification and some papers for the vehicle, including a California

17  registration.  Hearing Tr. (9/11/2020) at 2:02 – 2:03 p.m.  Officer Pappas took the keys to the

18  vehicle while he went back to his vehicle to run the information because he has had people in the

19  past drive away while he was conducting record searches.  Hearing Tr. (9/11/2020) at 2:03 p.m.

20      Officer Pappas returned to his vehicle to conduct a record search; however, his computer

21  terminal had an issue that did not allow him to run the search.  Hearing Tr. (9/11/2020) at 2:04

22  p.m.  As a result, he called into Records and found that there was a delay in getting into the system

23  because several officers also could not get access.  Hearing Tr. (9/11/2020) at 2:04 p.m., 2:37 p.m.

1   While at his car, Officer Pappas also called for backup because he thought it would be safer to

2   have more officers present. Hearing Tr. (9/11/2020) at 2:04 p.m., 2:36 p.m. While Officer Pappas

3   waited for the records check, he was able to run Defendant's local criminal history and found that

4   he had a federal firearms charge and an assault with a deadly weapon conviction for which he was

5   a registered felon. Hearing Tr. (9/11/2020) at 2:05 p.m. The criminal history check also indicated

6   that the passenger, Chester, was a registered felon. Hearing Tr. (9/11/2020) at 2:05 p.m.

7        It took about five minutes for the records check results to return over the phone. Hearing

8   Tr. (9/11/2020) at 2:07 p.m. During this five-minute period, Officer Pappas' partner told him that

9   the occupants of the vehicle were moving around inside the vehicle and Officer Pappas could see

10  the occupants moving, heads bobbing, and the car itself moving and shaking. Hearing Tr.

11  (9/11/2020) at 2:07 – 2:08 p.m. Officer Pappas' partner told him that he was concerned about

12  safety as a result of the movements. Hearing Tr. (9/11/2020) at 2:04 p.m. The officers noted that

13  both occupants of the vehicle were nervous. Hearing Tr. (9/11/2020) at 2:35 – 2:36 p.m. When

14  the officers received the results of the record check, they learned that the plate on the Kia vehicle

15  that Defendant was driving returned to a Hyundai, though the registration and the VIN matched.

16  Hearing Tr. (9/11/2020) at 2:07 p.m., 3:23 – 3:24 p.m. The car was registered to a rental company.

17  Hearing Tr. (9/11/2020) at 3:24 p.m. Officer Pappas described a "cold-plated vehicle" as a vehicle

18  with a plate on it that is not registered to that car, which is often done in an effort to avoid detection

19  by law enforcement. Hearing Tr. (9/11/2020) at 1:51 - 1:52 p.m. The officers determined that the

20  safest option was to pull the occupants of the vehicle out and talk to them. Hearing Tr. (9/11/2020)

21  at 2:07 p.m., 2:09 p.m., 2:36 p.m., 2:39 p.m.

22       Officer Pappas reapproached the vehicle, asked Defendant to exit the vehicle, and walked

23  him to the front of the patrol car. Hearing Tr. (9/11/2020) at 2:11 – 2:12 p.m. Since Officer Pappas

and his partner noticed that Defendant and his passenger had been moving around "a lot" in the vehicle and learned that the vehicle was cold-plated, Officer Pappas handcuffed Defendant for safety purposes and advised him that he was not under arrest but was being detained while officers determined what had happened with the vehicle.  Hearing Tr. (9/11/2020) at 2:12 p.m., 3:23 p.m., 3:24 – 3:25 p.m., 3:36 p.m.

Officer Pappas conducted a pat-down of Defendant for weapons.  Hearing Tr. (9/11/2020) at 2:12 p.m.  Defendant's waistband was covered by a shirt and, as Officer Pappas patted him down, he felt what he immediately believed to be a holster in Defendant's right front appendix. Hearing Tr. (9/11/2020) at 2:12 – 2:13 p.m., 2:21 p.m., 2:55 p.m., 3:31 p.m., 3:58 p.m.  Officer Pappas did not manipulate the object with his fingers or try to manipulate it in any other way – he used only his palm during the pat-down.  Hearing Tr. (9/11/2020) at 2:43 p.m.  Officer Pappas asked Defendant what was in his pants.  Hearing Tr. (9/11/2020) at 2:40 p.m., 2:43 p.m., 3:36 p.m., 4:00 p.m., 4:05 p.m.  Although the officer knew that the object – from placement and feel – was a holster, he asked Defendant what it was to give him an opportunity to be honest with him.  Hearing Tr. (9/11/2020) at 2:43 – 2:44 p.m., 4:02 p.m.  Instead, Defendant first said it was a belt buckle and then he said it was a wallet.  Hearing Tr. (9/11/2020) at 2:12 p.m., 2:41 – 2:42 p.m., 2:44 p.m., 3:36 p.m.  Officer Pappas said the object was a holster and Defendant said it was not a holster. Hearing Tr. (9/11/2020) at 2:41 p.m., 3:36 p.m.  Defendant reached around and pulled his shirt up, causing Officer Pappas to be able to see what he believed was a holster.  Hearing Tr. (9/11/2020) at 2:13 p.m., 2:45 p.m., 3:34 p.m., 4:01 p.m., 4:07 p.m.

Officer Nahum's bodycam video shows Defendant pulling his shirt up while Officer Pappas' right hand is by his side and his left hand is holding Defendant's handcuffs.  Hearing Tr. (9/11/2020) at 2:47 – 2:48 p.m., 3:49 p.m., 4:04 – 4:05 p.m.  Officer Pappas was not putting any

pressure on the handcuffs since Defendant was being cooperative; rather, he was allowing

Defendant to move freely, but keeping his hand on the handcuffs in case Defendant became

uncooperative and he needed to restrain him.  Hearing Tr. (9/11/2020) at 3:49 – 3:50 p.m.

Officer Pappas owned firearms before he became a police officer and continues to own

them as a police officer.  Hearing Tr. (9/11/2020) at 3:31 p.m., 3:50 p.m.  He carries a firearm

while on duty and he carries a firearm while off duty.  Hearing Tr. (9/11/2020) at 3:50 p.m.

Further, Officer Pappas has participated in "hundreds" of gun-related arrests.  Hearing Tr.

(9/11/2020) at 1:50 p.m.  Officer Pappas has worn a concealed firearm every day since he has been

a police officer and is familiar with how firearms are concealed and holstered on a person.  Hearing

Tr. (9/11/2020) at 1:52 p.m.  Statistically, the front right appendix is the place where most right-

handed people carry concealed firearms, and that area is where Officer Pappas has "usually"

located concealed firearms.  Hearing Tr. (9/11/2020) at 1:52 p.m., 1:53 p.m.  Further, Officer

Pappas has seen makeshift methods of carrying concealed firearms, including SCUBA gear

tailored with duct tape to make a holster.  Hearing Tr. (9/11/2020) at 1:53 – 1:54 p.m.

Officer Pappas carries an IWB, or an inside the waistband holster, which is the easiest and

most comfortable way to carry a concealed firearm and also offers the quickest access to the

firearm.  Hearing Tr. (9/11/2020) at 1:54 p.m.  An IWB is usually made of leather or kydex (a type

of plastic), is bottomless, and has a clip to clip to the user's clothing or belt.  Hearing Tr.

(9/11/2020) at 1:54 – 1:55 p.m.  IWB holsters are generally clipped to the beltline, providing

immediate access to the wearer.  Hearing Tr. (9/11/2020) at 1:55 p.m.  Higher-end holsters are

generally molded in the shape of the firearm that they are supposed to carry.  Hearing Tr.

(9/11/2020) at 3:59 p.m.  If the De Walt holster that Officer Pappas recovered from Defendant had

been used to carry a firearm on a regular basis, it should have had an imprint of a firearm, which

might be able to be seen with the naked eye.  Hearing Tr. (9/11/2020) at 3:59 – 4:00 p.m.  Officer Pappas did not see a firearm imprint on the holster, but he did see some defects in it.  Hearing Tr. (9/11/2020) at 4:00 p.m.

When Defendant pulled his shirt up, Officer Pappas saw a metal clip holding a leather holster in Defendant's pants.  Hearing Tr. (9/11/2020) at 2:14 p.m., 2:46 p.m.  Defendant dropped his shirt back down and Officer Pappas pulled Defendant's shirt back up, removed the De Walt brand holster, and put it on the hood of his patrol car, while saying that it was a holster.  Hearing Tr. (9/11/2020) at 2:14 p.m., 2:46 p.m., 4:06 p.m.  Defendant continued to say that the item was not a holster.  Hearing Tr. (9/11/2020) at 2:14 p.m.  Nonetheless, Officer Pappas was convinced that the item he removed from Defendant's waistband was an IWB holster – it had all the characteristics of the IWB holster that Officer Pappas himself carries every day.  Hearing Tr. (9/11/2020) at 2:20 p.m.

After finding the holster, Officer Pappas ran a more complete criminal history of the occupants of the vehicle to confirm that they were prohibited from possessing firearms.  Hearing Tr. (9/11/2020) at 2:19 p.m.  Officer Pappas applied to Judge Tobiasson in state court for a telephonic search warrant to search the vehicle and noted the criminal history in the search warrant affidavit.  Hearing Tr. (9/11/2020) at 2:19 p.m., 3:43 p.m., 3;46 p.m.  In the affidavit, Officer Pappas described the holster as an IWB holster capable of holding a firearm.   Hearing Tr. (9/11/2020) at 2:21 p.m.  Officer Pappas described finding the holster during a pat-down in the front right appendix area and also described Defendant lifting his shirt up so Officer Pappas could see the IWB holster in his waistband.  Hearing Tr. (9/11/2020) at 2:22 p.m., 3:47 p.m.  As a result of his affidavit, Officer Pappas obtained a search warrant to search the vehicle that Defendant had been driving, and to obtain buccal swabs from both Defendant and his passenger.  Hearing Tr.

1  (9/11/2020) at 2:22 p.m. During the search of the vehicle, Officers recovered a black Glock 19

2  firearm in the glove box and a nickel-plated Kahr Arms subcompact firearm with a 12-round

3  magazine and a laser attached to the trigger guard behind the glove box. Hearing Tr. (9/11/2020)

4  at 2:22 – 2:23 p.m. DNA was found on the Kahr Arms magazine that was consistent with

5  Defendant's DNA. Hearing Tr. (9/11/2020) at 2:23 p.m., 2:30 p.m. The Kahr Arms firearm is of

6  a size that it would fit into the holster recovered from Defendant. Hearing Tr. (9/11/2020) at 3:04

7  p.m.

8             **B.  Testimony of Officer Nahum**

9         On July 3, 2019, LVMPD Police Officer Edgar Nahum was on duty with his partner Officer

10  Pappas. Hearing Tr. (9/11/2020) at 4:10 p.m. The two officers arrested Defendant and Justin

11  Chester on that day. Hearing Tr. (9/11/2020) at 4:11 p.m. After stopping and initially approaching

12  Defendant's vehicle, the officers returned to their patrol vehicle to conduct a records check.

13  Hearing Tr. (9/11/2020) at 4:11 p.m. During that time, Officer Nahum observed so much

14  movement in Defendant's vehicle that the vehicle was shaking. Hearing Tr. (9/11/2020) at 4:12

15  p.m. Officer Nahum could see the vehicle's occupants' heads bobbing around inside the vehicle.

16  Hearing Tr. (9/11/2020) at 4:12 p.m. Officer Nahum also observed Chester reaching near the

17  center console of the vehicle and alerted his partner that the occupants of the vehicle were moving

18  around. Hearing Tr. (9/11/2020) at 4:13 p.m.

19      **II.  ANALYSIS**

20          **A.  Credibility of Witnesses**

21         The Court ordered an evidentiary hearing in order to make an accurate determination of

22  what occurred in the instant case and how the facts relate to the applicable caselaw. "The

23  longstanding and repeated invocations in caselaw of the need of district courts to hear live

8

1   testimony so as to further the accuracy and integrity of the factfinding process are not mere

2   platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system."

3   *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).   "[J]udges simply cannot decide

4   whether a witness is telling the truth on the basis of a paper record and must observe the witnesses'

5   demeanor to best ascertain their veracity - or lack thereof."   *Oshodi v. Holder*, 729 F.3d 883, 892

6   (9th Cir. 2013) (internal citation omitted).   *See also United States v. Howell*, 231 F.3d 615, 621

7   (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant

8   disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can

9   be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's

10   credibility").

11       During the evidentiary hearing in this matter, the Court had the opportunity to listen to the

12   testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and

13   to weigh each witness' credibility.   Having done so, the Court finds that both officers testified

14   credibly.

15               **B.      Motion to Suppress**

16       Defendant asks the Court to suppress the evidence seized from him and all evidence

17   subsequently discovered as a result of that seizure.   Docket No. 39.   Specifically, Defendant

18   submits that he was subjected to a *Terry* pat-down absent any articulable suspicion that he was

19   armed or dangerous.   *Id.* at 7-10.   Defendant further submits that Officer Pappas' pat-down

20   exceeded the scope of a permissible *Terry* pat-down when he retrieved the holster from underneath

21   Defendant's shirt.   *Id.* at 10-12.   Finally, Defendant submits that Officer Pappas impermissibly lied

22   in obtaining the warrant to search the vehicle.   *Id.* at 12-15.   Defendant submits that these violations

23   to his rights resulted in the ability to search the vehicle; therefore, he asks the Court to suppress all

of the evidence found in the search of the vehicle. *Id.* at 2. Lastly, Defendant submits that the inevitable discovery exception does not apply in the instant case because the vehicle would not have been impounded and, alternatively, the officers could have turned the car over to its owner (Hertz). *Id.* at 15.

In response, the United States submits that the officers' conduct leading to the search warrant and arrest of Defendant was "well within the boundaries of the Fourth Amendment." Docket No. 43 at 6. The United States submits that Officer Pappas had reasonable suspicion that Defendant was armed and dangerous because, *inter alia*, Defendant attempted to leave his vehicle, is a member of a violent gang, and made furtive movements in his vehicle while the officers ran the records check. *Id.* at 8-9. The United States further submits that the scope of the *Terry* pat-down was proper because Officer Pappas immediately knew the object was a holster and Defendant lifted his own shirt. *Id.* at 14. Additionally, the United States submits that Officer Pappas' representations in obtaining the warrant were accurate and, even if not, the mistakes were *de minimis*. *Id.* at 14-17. Finally, the United States submits that, in any event, both the automobile exception and the inevitable discovery exception apply. *Id.* at 17-19.

In reply, Defendant primarily argues against the government's characterization of the events at issue. *See* Docket No. 45.

### 1. *Terry* **Pat-down**

"The Fourth Amendment permits brief investigative stops ... when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (internal quotation marks omitted). An investigatory detention, a brief seizure by police based on reasonable suspicion of criminal activity, is a "narrowly drawn exception to the probable cause requirement of the Fourth

Amendment." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). *See also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (*en banc*) (Fourth Amendment permits investigatory stops when law enforcement officers have "reasonable suspicion" that criminal activity "may be afoot") (internal quotation marks omitted). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (*en banc*).

The police may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-down frisk for weapons. *Terry*, 392 U.S. at 22-24. "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* at 21 (citations and internal quotation marks omitted). "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008). Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted).

Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus-even those factors

that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). Reasonable suspicion may depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (internal citation omitted). *See also Lopez-Soto*, 205 F.3d at 1105 (*quoting United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)) (police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation'").

When considering the totality of the circumstances, courts must keep in mind that reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983). Reasonable suspicion may not be based on "broad profiles," "overbroad generalizations," or "a prefabricated or recycled profile of suspicious behavior[.]" *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal quotation marks omitted). However, a stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). Moreover, given that the standard for reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *Id*. (internal quotation marks omitted).

Temporarily handcuffing Defendant does not make the *Terry* frisk automatically invalid because a permissible *Terry* frisk takes place when an officer suspects the Defendant is dangerous. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1983) ("A brief but complete restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop and does not necessarily convert the stop into an arrest."). Indeed, it stands to reason that the issue of whether Defendant was permissibly handcuffed prior to the pat-down collapses into whether the officer reasonably believed the individual was armed and dangerous (and therefore justified in conducting a *Terry* frisk). *See, e.g.*, *United States v. Kinsey*, 952 F. Supp. 2d 970, 973 (E.D. Wash. 2013).

The court must, therefore, determine whether Defendant's investigatory detention was based on reasonable suspicion. Whether a person has been seized for purposes of the Fourth Amendment is a mixed question of law and fact. *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994). The Ninth Circuit defines "reasonable suspicion" as "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000) (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000)). If an officer does not have reasonable suspicion, and the stop therefore violates the Fourth Amendment, any evidence obtained as a result of the stop must be suppressed as fruit of the poisonous tree. *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

In looking at the totality of the circumstances, the Court finds that specific, articulable facts, together with objective and reasonable inferences, existed to give rise to reasonable suspicion. Officer Pappas first noticed Defendant looking at him with a "deer in the headlights

13

look" as the cars drove past each other. Defendant then failed to fully stop at a stop sign. When Officer Pappas attempted to pull the vehicle over, Defendant drove past at least one area where he could have stopped before he eventually stopped the vehicle. When Officer Pappas approached the vehicle on foot, Defendant had opened his door and was watching the officer approach. Officer Pappas noticed a tattoo on Defendant's face that was consistent with gang membership. While Officer Pappas conducted a records check, Defendant and his passenger made furtive movements in their vehicle, to the extent that the vehicle moved and/or shook. Officer Pappas learned that the vehicle was cold-plated and that both Defendant and his passenger had felony convictions. Clearly, in examining the totality of the circumstances and including the officer's training and experience, reasonable suspicion existed. *See United States v. Burkett*, 612 F.3d 1103 (9th Cir. 2010). The Court therefore finds that the *Terry* pat-down was appropriate.

### 2. Scope of *Terry* Pat-down

To pass constitutional muster, a *Terry* frisk must be "carefully limited [to] . . . the outer clothing . . . in an attempt to discover weapons which might be used to assault" an officer. *Terry*, 392 U.S. at 20, 29-30. Because a *Terry* frisk is limited to the individual's outer clothing, the scope of the search is proper only if any incriminating evidence was immediately apparent during the pat-down. *See United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012). Therefore, if incriminating evidence is only uncovered as a result of a more intrusive search, the scope is improper, and the uncovered evidence is subject to the exclusionary rule. *See, e.g.*, *id.* at 440-42. The burden falls on the government to demonstrate that the scope of the *Terry* frisk was proper. *See id.* at 440 ("The [g]overnment bears the burden of proving that the incriminating character of an object was immediately identifiable . . . .").

14

Officer Pappas testified that he recognized the item on Defendant's waistband as a holster immediately, based on his training and experience, without need to manipulate the item with his fingers.  Officer Pappas further testified that he asked Defendant what the item was in an effort to give Defendant an opportunity to be honest with him.  Defendant gave two different responses about what the item was.  Further, Officer Pappas testified that Defendant pulled his own shirt up, allowing the officer to see the item, which confirmed to him that it was a holster.[4]  At that time, Officer Pappas already knew that Defendant had a gun-related conviction and that he and his passenger were making furtive movements in the vehicle.  *See United States v. Spencer*, 1 F.3d 742, 746 (9th Cir. 1992) (police justified in believing a firearm might be in vehicle after discovering a shoulder holster under defendant's jacket during Terry frisk and observing defendant's furtive movements in vehicle).

The Court finds the officer's testimony, which was tested by cross-examination and corroborated by his partner's bodycam footage showing the officer's hands at the moment Defendant pulled his shirt up, credible.[5]  The Court therefore finds that Officer Pappas did not exceed the scope of the *Terry* frisk.

. . . .

---

[4]     The parties argue about whether Defendant initially pulled his shirt up or whether Officer Pappas did so.  In light of Officer Pappas' testimony that he recognized the item as a holster as soon as he felt it, the Court finds that the issue of who pulled the shirt up is irrelevant to this analysis.  Nonetheless, the evidence on Officer Nahum's bodycam video demonstrates that Defendant pulled his shirt up the first time.

[5]     While the holster is made by DeWalt, a tool company, the Court finds that that fact does not impact its decision.  Officer Pappas testified that the holster was of the same size and shape as the IWB holster he wears, that it was in a location on Defendant's body where people commonly carry firearms, and that it could hold the firearm that was found to have Defendant's DNA on it.  Therefore, even if the holster was made to carry tools and not a firearm, Officer Pappas properly recovered it from Defendant.

### 3.  Search Warrant

Defendant submits that Officer Pappas lied in his search warrant affidavit about how he discovered the holster and what the holster actually is; therefore, he asks the Court to suppress the evidence recovered during the search of the vehicle.  Docket No. 39 at 14.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed at length whether a false statement by a government affiant invalidates a search warrant.  *United States v. Hammett*, 236 F.3d 1054, 1058 (9th Cir. 2001) (citation omitted).  The Court held that, under certain circumstances, a defendant is entitled to an evidentiary hearing to afford the defendant an opportunity to attack the veracity of a facially-valid affidavit used to support a search warrant.  A defendant can challenge a facially valid affidavit by making a substantial preliminary showing that "(1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information."  *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (citing *United States v. Stanert,* 762 F.2d 775, 780-81 (9th Cir. 1985)).

Before a criminal defendant is entitled to go beneath the search warrant to obtain additional information concerning the police investigation and an informant, he or she is required to make a substantial threshold showing.  A defendant's preliminary showing cannot be "merely conclusory."  *Reeves*, 210 F.3d at 1044.  "There must be allegations of deliberate falsehood or reckless disregard for the truth, and these allegations must be accompanied by an offer of proof."  *Hammett*, 236 F.3d at 1058 (*quoting Franks*, 438 U.S. at 171).  "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof."  *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).  The movant bears the burden of proof and must

16

1    make a substantial showing to support both elements. *See United States v. Garcia–Cruz*, 978 F.2d

2    537, 540 (9th Cir.1992).

3          Intentional or reckless omissions may provide grounds for a *Franks* hearing.  *United States*

4    *v. Jawara*, 474 F.3d 565 (9th Cir. 2007)); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th

5    Cir. 1985) ("By reporting less than the total story, an affiant can manipulate the inferences a

6    magistrate [judge] will draw.  To allow a magistrate [judge] to be misled in such a manner could

7    denude the probable cause requirement of all real meaning").  Although "[c]lear proof of deliberate

8    or reckless omission is not required," a "[d]efendant 'must offer direct evidence of the affiant's

9    state of mind or inferential evidence that the affiant had obvious reason for omitting facts in order

10   to prove a deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809,

11   822-23 (7th Cir. 2003).  A defendant must also show that the "affidavit, once corrected and

12   supplemented," would not "provide ... a substantial basis for concluding that probable cause

13   existed." *Stanert*, 762 F.2d at 782.  "[T]he omission rule does not require an affiant to provide

14   general information about every possible theory, no matter how unlikely, that would controvert

15   the affiant's good-faith belief that probable cause existed for the search." *Craighead* 539 F.3d at

16   1081.

17         Here, the Court need not determine whether Defendant made the substantial preliminary

18   showing necessary for a *Franks* hearing, as an evidentiary hearing occurred on this motion.[6]  The

19   Court has already found that Officer Pappas was truthful in his testimony at the evidentiary hearing

20   and, therefore, that he properly engaged in a *Terry* pat-down and recovered the holster from

21   Defendant.  The Court has further found that, though the holster was made by a tool company,

22

---

23   [6]    Nonetheless, the Court notes that Defendant failed to make the required offer of proof in his motion.  *See Craighead*, 539 F.3d at 1073.

Officer Pappas credibly testified that he has found items used as holsters that were not initially made for such use and that, under the totality of the circumstances considering his training and experience, Officer Pappas reasonably believed that the item he found was being used as a holster for a firearm.  Therefore, the Court now finds that Officer Pappas did not make intentionally or recklessly false statements in his affidavit for a search warrant for the vehicle Defendant was driving.  As a result of this finding, the Court need not reach the issue of materiality, as Defendant's *Franks* claim fails.[7]

## III.    **RECOMMENDATION**

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 39, be **DENIED**.

DATED: October 21, 2020.

NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file

---

[7]    The Court also need not address the parties' inevitable discovery and automobile exception arguments.

a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).